# IN THE UNITED STATES DISTRICT COURT

## FOR THE DISTRICT OF OREGON

### PORTLAND DIVISION

| | |
|---|---|
| **D. BRUTKE'S VICTORY HILLS, LLC, et al.,** | Case No. 3:12-cv-01951-SI |
| Plaintiffs, | |
| v. | **OPINION AND ORDER** |
| **JOSEPH C. TUTERA,** | |
| Defendant. | |

Christopher J. Kayser & Cody Hoesly, Larkins Vacura, LLP, 621 SW Morrison Street, Suite 1450, Portland, OR 97205. Michael J. Esler & John W. Stephens, Esler, Stephens & Buckley, LLP, 888 SW Fifth Avenue, Suite 700, Portland, OR 97204. Attorneys for Plaintiffs.

Laura J. Walker, Cable Huston Benedict Haagensen & Lloyd, LLP, 1001 SW Fifth Avenue, Suite 2000, Portland, OR 97204. Timothy J. Sear, Polsinelli PC, 6201 N. College Boulevard, Suite 500, Overland Park, KS 66211. Attorneys for Defendant.

**Michael H. Simon, District Judge**.

Plaintiffs are limited liability companies ("LLC Plaintiffs") and several of their members ("Individual Plaintiffs"). Plaintiffs filed a lawsuit against Defendant Joseph Tutera, a citizen of Kansas, for claims arising out of the purchase and management of a Kansas retirement facility, Victory Hills ("the Facility"). Defendant filed a motion to dismiss for lack of personal jurisdiction (Dkt. 5), after which the Court granted Plaintiffs leave to take jurisdictional discovery and file an amended complaint. Plaintiffs filed an amended complaint (Dkt. 26), and Defendant renewed and amended his motion to dismiss (Dkt. 28). For the reasons stated below, Defendant's amended motion to dismiss is DENIED.

**BACKGROUND**

In 2007, Individual Plaintiffs formed the LLC Plaintiffs in order to purchase fractional tenant-in-common ("TIC") interests, totaling 62.25%, in the Facility. Am. Compl. ¶¶ 30-31. Sunwest Management, Inc. ("Sunwest"), an Oregon corporation, owned the remaining 37.75% interest in the Facility through an affiliate, Kansas City Senior Living Property LLC ("Original Co-Owner"). *Id.* at ¶¶ 15, 31. Another Sunwest affiliate leased the Facility to a third Sunwest affiliate, who managed and operated the Facility. *Id.* During this time, a mortgage and promissory note in the amount of $7,700,000 held by First State Bank of Kansas City ("Bank") encumbered the Facility. *Id.*

In 2009, the Securities and Exchange Commission filed a lawsuit against Sunwest and its Chief Executive Officer, Jon Harder. *Id.* at ¶¶ 15-17. In that case, the court appointed a receiver to manage the orderly concluding of Sunwest's businesses, including the distribution of its assets. *See generally S.E.C. v. Sunwest, et al.*, 6:09-cv-06056-AA (D. Or.). To protect their

investment, Plaintiffs began considering various ways to divest Sunwest's interest in and management of the Facility. Am. Compl. ¶ 33.

Around November 2008, Plaintiff LLCs' steering committee began researching entities that could help extract the Facility from Sunwest's receiver. Geistlinger Decl. ¶ 2. As part of the steering committee's due diligence, the committee corresponded with Michael Flanagan, Defendant's attorney, and participated in a conference call with Mr. Flanagan and Defendant. Am. Compl. ¶ 34-35. On November 26, 2008, Mr. Flanagan sent a written proposal to the steering committee, which outlined his and Defendant's previous experience with Sunwest and with managing retirement facilities. Hoesly Decl., Ex. C-12. On December 3, 2008, Mr. Flanagan sent the steering committee a letter confirming Plaintiffs' engagement of "[Defendant] and me to assist the [Plaintiff LLCs] in attempting to implement one of the proposals outlined." Hoesly Decl., Ex. C-13. This letter authorized Defendant and Mr. Flanagan to negotiate with Sunwest and the Bank on Plaintiffs' behalf. *Id.*

After Plaintiffs engaged Defendant, there was a substantial amount of communication among Plaintiffs, Defendant, Sunwest, and Sunwest's receiver. Am. Compl. ¶ 38. Defendant encouraged Plaintiffs to retain Paul Connolly, an attorney in Salem, Oregon, to represent Plaintiffs in their efforts. *Id.* at ¶ 40. Defendant was already working with Mr. Connolly on other Sunwest properties, and Defendant agreed that one of Defendant's entities would pay Mr. Connolly's fees in working for Plaintiffs. *Id.* On February 23, 2009, Mr. Flanagan sent Mr. Connolly an email that stated, "we think we are very close to getting a deal . . .  with Sunwest." Hoesly Decl. ¶ C-15. Per this email, one of Defendant's entities would receive Sunwest's 37.75% interest in the Facility, which Defendant and his entities would lease and manage. *Id*

Despite these discussions with Defendant, Plaintiffs were also considering replacing Defendant with one of his competitors. *See* Am. Compl. ¶ 45. In the spring of 2009, Plaintiffs decided not to continue working with Defendant. *Id.* Defendant, however, pursued Individual Plaintiff Chris Valentine, explaining why Defendant was the ideal partner to oversee and protect Plaintiffs' investment in the Facility. *Id.* at ¶ 46. In May 2009, Plaintiffs reversed their decision and agreed to receive Defendant's help. *Id.*

After extensive negotiations and in exchange for a release of Plaintiffs' claims against Sunwest, amounting to $2,700,000, Sunwest's receiver agreed to transfer Sunwest's interest in the Facility to Defendant. Am. Compl. ¶ 47. Defendant then assumed the responsibility of operating the Facility, including negotiating with the Bank, attempting to solve the Facility's financial problems, and restructure the Facility's debt. *Id.* Three different Kansas limited liability companies, each owned and controlled by Defendant, owned Defendant's interest in, leased, and managed the Facility, respectively. *Id.* at ¶ 48. Defendant also assumed Sunwest's former obligations under the mortgage, which by then had a secured amount of $7,925,000 with an interest rate of 8% per year. *Id.*

Following Defendant's negotiations, the Bank granted two extensions of the note's maturity date, resulting in final maturation on August 31, 2012. *Id.* at ¶ 50. Despite these extensions, Defendant failed to renegotiate the terms of the loan, obtain financing from the U.S. Department of Housing and Urban Development ("HUD"), or otherwise solve the Facility's financial problems. *Id.* Defendant also failed to keep Plaintiffs timely apprised of Defendant's efforts or allow Plaintiffs to participate in the negotiation with the Bank. *Id.* For example, although Defendant learned in January 2012 that the Facility would not qualify for HUD refinancing, Defendant did not inform Plaintiffs. *Id.* at ¶ 51.

Around April 2012, Defendant began negotiating with the Bank personally to buy the loan outright for himself. *Id.* at ¶ 52. Although these negotiations lasted through the summer, Defendant did not disclose to Plaintiffs Defendant's efforts to buy the entire loan for himself. *Id.* Instead, through August 2012, Mr. Flanagan continued to inform Plaintiffs that the refinancing negotiations were going smoothly and that Defendant was negotiating another extension of the loan. *Id.* On August 14, 2012, Mr. Flanagan, on behalf of Defendant, offered to purchase the entire loan from the Bank for $3,500,000, noting that Defendant "may never actually be able to foreclose on [the Facility] without running the risk of getting sued by the [Plaintiff LLCs]." *Id.* at ¶ 53.

On August 31, 2012, Mr. Flanagan informed Plaintiffs of Defendant's completed purchase of the entire loan from the Bank and extended Defendant's offer to Plaintiffs to extend the loan's maturity date to September 30, 2012. *Id.* at ¶ 57; Hoesly Decl., Ex. C-25. If Plaintiffs did not accept the proposed extension, Mr. Flanagan told Plaintiffs, Defendant would foreclose on the Facility. Am. Compl. ¶ 57. In later correspondence, Mr. Flanagan stated that Defendant did not want Plaintiffs to remain involved with the Facility, and Defendant offered to buy out all of Plaintiffs' shares of the Facility for a total of $62,500. *Id.* at ¶ 58.

## STANDARDS

On a motion to dismiss for lack of personal jurisdiction brought pursuant to Federal Rule of Civil Procedure 12(b)(2), the plaintiff bears the burden of demonstrating that the court's exercise of jurisdiction is proper. *See Schwarzenegger v. Fred Martin Motor Co.*, 374 F.3d 797, 800 (9th Cir. 2004) (citing). When the court's determination is based on written materials rather than an evidentiary hearing, "the plaintiff need only make a prima facie showing of jurisdictional facts," *Sher v. Johnson*, 911 F.2d 1357, 1361 (9th Cir. 1990), and the court must "only inquire

into whether the plaintiff's pleadings and affidavits make a prima facie showing of personal

jurisdiction." *Schwarzenegger*, 374 F.3d at 800 (quotation marks omitted) (quoting *Caruth v.*

*Int'l Psychoanalytical Ass'n*, 59 F.3d 126, 128 (9th Cir. 1995)). A plaintiff cannot rest solely on

the bare allegations of its complaint, but uncontroverted allegations in the complaint must be

taken as true. *Id.* Conflicts among the parties over statements contained in affidavits must be

resolved in the plaintiff's favor. *Id.*; *see also Am. Tel. & Tel. Co. v. Compagnie Bruxelles*

*Lambert*, 94 F.3d 586, 588 (9th Cir. 1996); *Bancroft & Masters, Inc. v. Augusta Nat'l Inc.*, 223

F.3d 1082, 1087 (9th Cir. 2000).

## DISCUSSION

Unless a federal statute governs personal jurisdiction, a district court applies the law of

the forum state. *See Boschetto v. Hansing*, 539 F.3d 1011, 1015 (9th Cir. 2008). Oregon's long-

arm statute is co-extensive with constitutional standards. *Gray & Co. v. Firstenberg Mach. Co.*,

913 F.2d 758, 760 (9th Cir. 1990) (citing Or. R. Civ. Pro. 4(L); *Oregon ex rel. Hydraulic*

*Servocontrols Corp. v. Dale*, 657 P.2d 211, 212 (Or. 1982)). Thus, the Court need only

determine whether its exercise of personal jurisdiction would offend constitutional due process

requirements. *See Boschetto*, 539 F.3d at 1015; *see also Hydraulic Servocontrols*, 657 P.2d

at 212-13.

Due process requires that the defendant "have certain minimum contacts with [the forum]

such that the maintenance of the suit does not offend 'traditional notions of fair play and

substantial justice.'" *Int'l Shoe Co. v. Washington*, 326 U.S. 310, 316 (1945) (citations omitted).

The Supreme Court has rejected the application of "mechanical" tests to determine personal

jurisdiction. *Id.* at 319; *see also Burger King Corp. v. Rudzewicz*, 471 U.S. 462, 478 (1985).

Rather, a court should consider the "quality and nature of the activity in relation to the fair and

orderly administration of the laws which it was the purpose of the due process clause to insure." *Int'l Shoe*, 326 U.S. at 319.

"There are two forms of personal jurisdiction that a forum state may exercise over a nonresident defendant—general jurisdiction and specific jurisdiction." *Boschetto*, 539 F.3d at 1016. A court has general personal jurisdiction over a defendant whose contacts with the forum are "continuous and systematic," even if those contacts are wholly unrelated to the plaintiff's claims. *Helicopteros Nacionales de Colombia, S.A. v. Hall*, 466 U.S. 408, 415-16 (1984). If the court lacks general personal jurisdiction, it may have specific personal jurisdiction if the defendant has certain minimum contacts with the forum state, the controversy arose out of those contacts, and the exercise of jurisdiction is reasonable. *See Burger King*, 471 U.S. at 472-74. Here, Plaintiffs do not argue that the Court may exercise general jurisdiction over Defendant; instead, Plaintiffs allege only specific jurisdiction.

## A. Fiduciary Shield Doctrine

As an initial matter, the parties dispute whether Defendant's actions taken on behalf of his various LLCs are attributable to him personally or are even relevant to the Court's jurisdictional analysis. Defendant argues that pursuant to the fiduciary shield doctrine only those actions he took in a personal capacity may be used to support the Court's exercise of personal jurisdiction against him. Plaintiffs respond that the fiduciary shield doctrine has not been adopted in the Ninth Circuit, and even if the doctrine were recognized, Plaintiffs believed they were dealing with Defendant personally or Defendant acted as the "alter ego" of his limited liability companies.

"Under the fiduciary shield doctrine, a person's mere association with a corporation that causes injury in the forum state is not sufficient in itself to permit that forum to assert jurisdiction

over the person." *Davis v. Metro Prods., Inc.*, 885 F.2d 515, 520 (9th Cir. 1989). Instead, a court

must have some basis to disregard the corporate form. *Id.* Generally, a court may disregard the

corporate form if the corporation is the "agent or alter ego" of an individual defendant or if there

"is an identity of interests" between the corporation and the individual defendant. *Id.* at 520-21.

Defendant argues that the actions he took on behalf of various entities cannot be used to

establish jurisdiction over him personally. In *Kransco Mfg. v. Markwitz*, 656 F.2d 1376 (9th Cir.

1981), the Ninth Circuit appeared to apply the fiduciary shield doctrine, noting that "a corporate

officer who has contact with a forum only with regard to the performance of his official duties is

not subject to personal jurisdiction in that forum." *Id.* at 1379 (quotation marks and citations

omitted). Citing *Kransco*, some district courts have similarly applied the fiduciary shield

doctrine. *See, e.g.*, *Sidco Indus. Inc. v. Wimar Tahoe Corp.*, 768 F. Supp. 1343 (D. Or. 1991).

In *Calder v. Jones*, 465 U.S. 783 (1984), the Supreme Court appears to reject the Ninth

Circuit's holding in *Kransco*, noting that the defendants' "status as employees does not somehow

insulate them from jurisdiction. Each defendant's contacts with the forum State must be assessed

individually." *Id.* at 790 (citation omitted); *see also Keeton v. Hustler Magazine, Inc.*, 465 U.S.

770, 781 n.13 (1984) (noting that the Court in *Calder* rejected "the suggestion that employees

who act in their official capacity are somehow shielded from suit in their individual capacity").

With *Calder* in mind, the Ninth Circuit in *Davis* concluded that the fiduciary shield doctrine does

not "create a due process limit on jurisdiction." *See Davis*, 885 F.2d at 521. Accordingly, the

fiduciary shield doctrine only applies when a state's long arm statute is "equitably limited" by

the doctrine. *See id.* at 522 ("[W]e conclude that because the Arizona long-arm statute extends to

the limit of constitutional due process, and because it is not equitably limited by the fiduciary

shield doctrine, the reach of long-arm jurisdiction in Arizona is effectively stretched by the

reasoning of *Calder* and *Keeton*.") (citation omitted); *see also Sher*, 911 F.2d at 1366 (finding personal jurisdiction over a partnership, due to the collective actions of its partners, but not finding personal jurisdiction over each partner individually).

Oregon appellate courts have not explicitly applied the fiduciary shield doctrine as an equitable limitation to Oregon Rule of Civil Procedure 4(L), which otherwise extends Oregon's long-arm statute to the limits of due process. In *Wong v. Wong*, 894 P.2d 519 (Or. App. 1995), the closest any Oregon court has come to applying that doctrine, the Oregon Court of Appeals found a defendant not subject to personal jurisdiction merely because he signed a letter in his capacity as President of a defendant corporation. *See id.* at 521. The court noted that there was no evidence that the defendant was the alter ego of the corporation; thus, the defendant's signing of the letter was not an act of the defendant individually. *Id.* at 522. The court in this case, however, did not expressly refer to the fiduciary shield doctrine.

The Court is only aware of a single published case in Oregon that specifically incants the fiduciary shield doctrine. In *Ram Technical Servs., Inc. v. Koresko*, 247 P.3d 1251 (Or. App. 2011), the Oregon Court of Appeals declined to adopt or even define the contours of the fiduciary shield doctrine. *Id.* at 1261. Other Oregon cases indirectly support the conclusion that the fiduciary shield doctrine does not equitably limit a court's exercise of personal jurisdiction. *See, e.g.*, *Giordano v. Aerolift, Inc.*, 840 P.2d 748, 749 (Or. App. 1992) (holding that jurisdiction was proper based on the defendant-directors' "involvement in Oregon, as directors and otherwise in the affairs of the corporation").

In addition, as the court noted in *Davis*, the fiduciary shield doctrine does not apply in jurisdictional contexts where the corporate form could be disregarded for liability purposes. *See Davis*, 885 F.2d at 520. Because "[a] corporate officer or director is, in general, personally liable

for all torts which he authorizes or directs or in which he participates, notwithstanding that he acted as an agent of the corporation and not on his own behalf," *Transgo, Inc. v. Ajac Transmission Parts Corp.*, 768 F.2d 1001, 1021 (9th Cir. 1985) (quotation marks and citation omitted), a court may consider all actions that a defendant took on behalf of the entities he or she controls when evaluating personal jurisdiction.[1] Accordingly, the Court considers the totality of Defendant's actions, whether taken individually or on behalf of his various entities, in assessing the Court's personal jurisdiction over Defendant.

Additionally, a court may consider the actions of a defendant's agent in deciding whether the exercise of personal jurisdiction comports with due process. *See Sher*, 911 F.2d at 1362 ("For purposes of personal jurisdiction, the actions of an agent are attributable to the principal."). Similarly, the knowledge of an agent is attributed to the agent's principal. *See F.D.I.C. v. Smith*, 980 P.2d 141, 146 (Or. 1999). For the purposes of this motion, it is undisputed that Mr. Flanagan acted as Defendant's agent during the relevant periods. *See* Am. Compl. ¶ 14. Thus, Mr. Flanagan's conduct and knowledge are attributable to Defendant.

**B. Specific Personal Jurisdiction**

The Ninth Circuit applies a three-part test to determine if the exercise of specific jurisdiction over a nonresident defendant is appropriate:

> (1)    The non-resident defendant must purposefully direct his activities or consummate some transaction with the forum or resident thereof; or perform some act by which he purposefully avails himself of the privilege of conducting activities in the forum, thereby invoking the benefits and protections of its laws;

---

[1] Because the Court did not hold an evidentiary hearing in this case and Plaintiffs' uncontroverted allegations are taken as true, the Court's finding is not conclusive as to Defendant's conduct on behalf of his various corporate entities. *See Schwarzenegger*, 374 F.3d at 800.

(2)    the claim must be one which arises out of or relates to the defendant's forum-related activities; and

(3)    the exercise of jurisdiction must comport with fair play and substantial justice, *i.e.* it must be reasonable.

*Brayton Purcell LLP v. Recordon & Recordon*, 606 F.3d 1124, 1128 (9th Cir. 2010) (quoting *Schwarzenegger*, 374 F.3d at 802). The plaintiff bears the burden as to the first two prongs, but if both are established, then "the defendant must come forward with a 'compelling case' that the exercise of jurisdiction would not be reasonable." *Boschetto*, 539 F.3d at 1016 (quoting *Schwarzenegger*, 374 F.3d at 802).

### 1. Minimum Contacts

The first prong embodies two distinct, although sometimes conflated, concepts: purposeful availment and purposeful direction. *See Brayton Purcell*, 606 F.3d at 1128; *Washington Shoe Co. v. A-Z Sporting Goods Inc.*, 704 F.3d 668, 672 (9th Cir. 2012). "A purposeful availment analysis is most often used in suits sounding in contract. A purposeful direction analysis, on the other hand, is most often used in suits sounding in tort." *Schwarzenegger*, 374 F.3d at 802 (internal citations omitted).

Although the parties agree that a purposeful availment analysis applies to Plaintiffs' breach of contract claim, Defendant disputes whether any of Plaintiffs' other claims should be subject to a purposeful direction analysis. Where claims "sound in tort" but arise from a contractual agreement, purposeful availment is the appropriate analytical framework. *See Sher*, 911 F.2d at 1360, 1362 (applying purposeful availment to a claim for legal malpractice, which the court concluded arose from a retainer agreement).

Defendant's duty to act as a fiduciary allegedly arose from the parties' agreement that Defendant would perform a number of functions relating to the Facility. In other words, without the contract between the parties, Defendant would owe no obligations—contractual or

fiduciary—to Plaintiffs. The significant difference, however, between Plaintiffs' breach of

contract claim and Plaintiffs' breach of fiduciary duty claim is the standard of conduct against

which Defendant's actions are measured. The parties' agreement triggered Defendant's duties as

a fiduciary, but it did not define the scope of those duties. *Cf. Lindland v. United Bus.

Investments, Inc.*, 693 P.2d 20, 23 (Or. 1984) (noting that the duty of loyalty encompasses

conflicts of interest and non-disclosed self-dealing). Because Oregon law, rather than the

agreement, defines the scope of the fiduciary duty owed by Defendant, Plaintiffs' claim for

breach of fiduciary duty sounds in tort. *Cf. See Secs.-Intermountain, Inc. v. Sunset Fuel Co.*, 611

P.2d 1158, 1166-67 (Or. 1980) (noting that where the parties to a contract "merely incorporate[] .

. . a general standard . . . of care to which the defendant would be bound independent of the

contract," then the claim is one for "breach of [a] noncontractual duty").

     Accordingly, the Court analyzes Plaintiffs' breach of contract claim using purposeful

availment and Plaintiffs' breach of fiduciary duty claim using purposeful direction.

### a. Purposeful Availment

     "To have purposefully availed itself of the privilege of doing business in the forum, a

defendant must have performed some type of affirmative conduct which allows or promotes the

transaction of business within the forum state." *Boschetto*, 539 F.3d at 1016 (quotations and

citation omitted). In cases involving contractual obligations, the Supreme Court emphasizes "the

need for a highly realistic approach that recognizes that a contract is ordinarily but an

intermediate step serving to tie up prior business negotiations with future consequences which

themselves are the real object of the business transaction." *Burger King*, 471 U.S. at 479

(quotations and citations omitted). A court's review of the contractual relationship must be

"practical and pragmatic." *Boschetto*, 539 F.3d at 1016. A court should consider "prior

negotiations and contemplated future consequences, along with the terms of the contract and the parties' actual course of dealing" in determining whether the defendant purposefully established minimum contacts within the forum. *Burger King*, 471 U.S. at 479.

An "individual's contract with an out-of-state party *alone*" cannot "automatically establish sufficient minimum contacts in the other party's home forum." *Burger King*, 471 U.S. at 478 (emphasis in original). Parties to an interstate contract who "reach out beyond one state and create continuing relationships and obligations with citizens of another state are subject to regulation and sanctions in the other State for the consequences of their activities." *Id.* at 473 (quotations and citation omitted). This continuing relationship must create a "substantial connection" between the defendant the forum state that is more than merely "random, fortuitous or attenuated." *Id*. at 479-80.

A defendant whose interstate contract contemplates "significant future consequences" in another state has the requisite continuing relationship with the parties to the contract in that state. *Roth v. Garcia Marquez*, 942 F.2d 617, 622 (9th Cir. 1991) (citations omitted). Similarly, a defendant who created continuing obligations to residents of another state has satisfied the "purposeful availment" requirement. *Ballard v. Savage*, 65 F.3d 1495, 1498 (9th Cir. 1995). Conversely, a continuing relationship is not established by a "one-time contract for the sale of a good that involved the forum state only because that is where the purchaser happened to reside, but otherwise created no substantial connection or ongoing obligations there." *Boschetto,* 539 F.3d at 1019 (citation omitted).

Defendant argues that he has not purposefully availed himself of the privilege of conducting business activities in Oregon because neither he nor Plaintiffs conduct any business in the forum state. Defendant operates his various business entities from the state of Kansas,

where the Facility is located. The actions or omissions Plaintiffs allege breach the relevant duties all involve the Facility: removing it from Sunwest's control, managing it, negotiating with the Kansas Bank, and Defendant's allegedly tortious purchase. Further, although Plaintiff LLCs are all organized in Oregon, Individual Plaintiffs are citizens of several states, including Oregon, Washington, California, and Kentucky. *See* Am. Compl. ¶¶ 1-13. From this, Defendant argues that Plaintiffs do not actually conduct any business in Oregon; the state was simply one of many where Plaintiffs could have organized the Plaintiff LLCs. Accordingly, because no parties actually conduct business in Oregon, Defendant argues, he could not have established the requisite minimum contacts with the forum.

The Court disagrees with Defendant's characterization of Plaintiff LLCs as conducting no business within the forum state. Individual Plaintiffs organized each Plaintiff LLC as a vehicle to hold an interest in the Facility. *See* Am. Compl. ¶ 31. Without Defendant's involvement, Plaintiffs' business activity in the forum would presumably encompass much more than simply "own[ing] Kansas real estate." Def.'s Reply at 9. The agreement between the parties shifted the responsibility for leasing, operating, and managing the Facility from Plaintiffs, who own 62.25% of the Facility, to Defendant. Am. Compl. ¶ 48. Whether Plaintiffs directly manage the facility or hire an agent to do so, Plaintiffs are engaged in business in the forum state. In addition, the parties allegedly engaged in substantial communication in Oregon to effectuate Defendant's role in protecting Plaintiffs' investment and obtaining Sunwest's interest in the Facility. *See* Am. Compl. ¶¶ 33-38 (alleging "hundreds of communications . . . between [Defendant] and [P]laintiffs"). Because Plaintiffs engaged in some business in the forum state, the Court looks at the contemplated "continuing relationships and obligations" among the parties. *See Burger King*, 471 U.S. at 473.

Page 14 – OPINION AND ORDER

Moreover, when a plaintiff has some tie to a forum state, the purposeful availment analysis generally focuses on the *defendant's* conduct and business dealings. *See, e.g.*, *Asahi Metal Indus. Co., Ltd. v. Sup. Ct. of Cal.*, 480 U.S. 102, 109 (1987) (O'Conner, J.) ("minimum contacts must be based on an act of the defendant"); *Boschetto*, 539 F.3d at 1016 (evaluating "the jurisdictional significance of a defendant's contract or other business in the forum"). Despite Defendant's contentions, the structure of the parties' relationship demonstrates jurisdictionally significant contacts by Defendant. The best example of Defendant's reach into the forum state is the details of his acquisition of Sunwest's interest in the Facility. Defendant did not purchase that interest. He exchanged Plaintiffs' claims against Sunwest for that interest. Plaintiffs did not gratuitously waive $2,700,000 in claims; they expected to receive something in return—Defendant's assistance in ensuring the continuing viability of the Facility. *See* Am. Compl. ¶¶ 36, 40, 47-49 (describing the parties' joint efforts to remove the Facility from Sunwest's management and ensure the Facility's future financial viability). Had Defendant simply purchased Sunwest's interest, becoming a tenant in common along with Plaintiff LLCs, Defendant's ongoing contacts with the forum might very well be minimal. *See Boschetto*, 539 F.3d at 1019 (distinguishing between jurisdictionally sufficient contacts and a "one-time" contract for the sale of goods). By entering into a more complex and continuing business relationship with his co-tenants, however, Defendant established the type of ties to the forum state that are jurisdictionally significant. *See Schneider v. Hardesty*, 669 F.3d 693, 702 (6th Cir. 2012) (finding purposeful availment on the basis of two letters containing misrepresentations, which evinced "an intent to establish an ongoing contact") (citing *Burger King*, 471 U.S. at 473).

The parties' relationship is strikingly different than the relationships courts have held lead to forum connections that are merely random or fortuitous. In *World-Wide Volkswagen*, a

product liability action, the Court required a manufacturer to do something more than produce a product that could be used in any given state before jurisdiction would be found. *See World-Wide Volkswagen Corp. v. Woodson*, 444 U.S. 286, 295 (1980) (describing as "fortuitous" that the allegedly defective product "sold in New York to New York residents, happened to suffer an accident while passing through Oklahoma"). In that situation, the defendant-manufacturer is not made aware of its exposure in a forum state until it is haled into court. *See id.* at 297 (drawing a connection between purposeful availment and a corporation-defendant's notice and opportunity to mitigate harm in the forum). In other words, the defendant is given no chance to "act to alleviate the risk of burdensome litigation by procuring insurance, passing the expected costs on to customers, or, if the risks are too great, severing its connection with the State." *Id.* Here, the parties' extended relationship and the principal-fiduciary nature of that relationship before Defendant's allegedly wrongful acts would have reasonably placed Defendant on notice that his conduct could have subjected him to suit wherever Plaintiffs were located, which Defendant knew included Oregon. *See Burger King*, 471 U.S. at 473.

### b.  Purposeful Direction

Purposeful direction is analyzed using a three-part test (the "effects test") from the Supreme Court's opinion in *Calder*. *See Schwarzenegger*, 374 F.3d at 803. To satisfy the effects test, "the defendant allegedly must have (1) committed an intentional act, (2) expressly aimed at the forum state, (3) causing harm that the defendant knows is likely to be suffered in the forum state." *Mavrix Photo, Inc. v. Brand Technologies, Inc.*, 647 F.3d 1218, 1228 (9th Cir. 2011) (quotation marks omitted), *cert. denied*, 132 S. Ct. 1101 (U.S. 2012). The test may be satisfied even if the defendant has no physical contact with the forum state. *See, e.g.*, *Schwarzenegger*, 374 F.3d at 803.

### i.  Intentional Act

The first question is whether Defendant acted intentionally when he allegedly failed to negotiate in good faith with the Bank and purchased the loan for his own benefit. "Intentional act" has a specialized meaning within the effects test; it is "an external manifestation of the actor's intent to perform an actual, physical act in the real world, not including any of its actual or intended results." *Washington Shoe*, 704 F.3d at 674-75. The parties do not dispute that Defendant committed an intentional act. Thus, the first prong is satisfied.

### ii.  Expressly Aimed

The second question is whether Defendant "expressly aimed" his conduct at Oregon. "[T]he 'express aiming' requirement is satisfied, and specific jurisdiction exists, 'when the defendant is alleged to have engaged in wrongful conduct targeted at a plaintiff whom the defendant knows to be a resident of the forum state.'" *Washington Shoe*, 704 F.3d at 675 (quoting *Dole Food Co. v. Watts*, 303 F.3d 1104, 1111 (9th Cir. 2002)). The analysis turns, "to a significant degree, on the specific type of tort or other wrongful conduct at issue." *Schwarzenegger*, 374 F.3d at 807. "[I]f a defendant is alleged to have defrauded or similarly schemed against someone with substantial ties to a forum, the 'expressly aimed' factor is met, even if all the defrauding activities occur outside the forum." *Fiore v. Walden*, 688 F.3d 558, 580 (9th Cir. 2012) (relying on *Bancroft & Masters*, 223 F.3d at 1087; *Metro. Life Ins. Co. v. Neaves*, 912 F.2d 1062, 1064-65 (9th Cir. 1990)), *cert. granted*, 133 S. Ct. 1493 (2013).

Defendant argues that his conduct was "expressly aimed" at only the Facility and its mortgage, which were both in Kansas. The Ninth Circuit has rejected this sort of argument, holding "the respective directions of the intentional act and the known impact need not coincide for the 'express aiming' requirement to be satisfied." *Washington Shoe*, 704 F.3d at 675. Defendant likens this case to *Schwarzenegger*, where the court found that the defendant's

allegedly unauthorized use of the plaintiff's image in advertising was aimed locally and not at the forum state. 374 F.3d at 807. *Schwarzenegger*, however, is distinguishable because here Defendant allegedly "*knew* that the impact of his intentional act would be felt in" Oregon. *Washington Shoe*, 704 F.3d at 677.

Plaintiffs allege that Defendant knew some or all of Plaintiffs were citizens of Oregon. *See, e.g.*, Hoesly Decl., Ex. C-L (identifying Plaintiff LLCs as Oregon LLCs). Further, Mr. Flanagan knew that many Plaintiffs were citizens of Oregon, Hoesly Decl., Ex. C, at pp. 15, 18, and Mr. Flanagan's knowledge is imputed to Defendant. *See, e.g.*, *Smith*, 980 P.2d at 146 ("[I]t is appropriate to impute knowledge of an agent to its principal."). Thus, the express aiming analysis turns on whether Defendant's wrongful conduct "targeted" Plaintiffs. *See Dole Food*, 303 F.3d at 1111.

The tort at issue in this case, breach of fiduciary duty, is distinguishable from "untargeted negligence." *See Washington Shoe*, 704 F.3d at 675 (quotation marks omitted). Rising above the duty of ordinary care, the heightened duties of a fiduciary may attach when there is a special relationship between the parties. *See Gangnes v. Lang*, 799 P.2d 670, 672 (Or. App. 1990). The alleged fiduciary relationship between the parties is a specific source of Defendant's knowledge that his alleged conduct "would have a potentially devastating impact upon" Plaintiffs. *See Washington Shoe*, 704 F.3d at 675 (quoting *Calder*, 465 U.S. at 789-90).

The Ninth Circuit recognizes that with intentional torts "the 'acts are performed for the very purpose of having their consequences felt in the forum state.'" *Washington Shoe*, 704 F.3d at 675 (quoting *Brainerd v. Governors of the Univ. of Alta.*, 873 F.2d 1257, 1260 (9th Cir. 1989)). Plaintiffs allege that Defendant breached his fiduciary duties through intentional, not negligent, actions and omissions. *See* Am. Compl. ¶ 64. Plaintiffs allege that Defendant

intentionally purchased the bank loan for his own benefit, failed to disclose that fact to Plaintiffs, and failed to receive Plaintiffs' approval, in breach of Defendant's fiduciary duties. *Id.* Because of the parties' fiduciary relationship, Defendant should have reasonably known that his alleged derogation of his fiduciary duty would target Plaintiffs, the intended beneficiaries of the heightened duty. *Cf. Mavrix Photo*, 647 F.3d at 1231 (distinguishing between a national newspaper, which can expect its online content to be seen nationwide, and a local newspaper, whose content is similarly accessible but does not have nationwide readership expectations).

### iii.  Foreseeable Harm

The third question is whether Defendant's "conduct caused harm that [he] knew was likely to be suffered in the forum." *Brayton Purcell*, 606 F.3d at 1131. "This element is satisfied when defendant's intentional act has 'foreseeable effects' in the forum." *Id.* "The 'brunt' of the harm need not be suffered in the forum state." *Yahoo! Inc. v. La Ligue Contre Le Racisme Et L'Antisemitisme*, 433 F.3d 1199, 1207 (9th Cir. 2006).

The second part of the effects test—express aiming—focuses on a defendant's actions, whereas the third part—foreseeable harm—looks at the allegedly harmful results of those actions. *See, e.g.*, *Mavrix Photo*, 647 F.3d at 1231-32. Among other allegations, Plaintiffs argue that Defendant breached his fiduciary duties by failing to disclose and seek ratification of Defendant's purchase of the loan; leveraging the threat of immediate default to purchase Plaintiffs' interests in the Facility; and mismanaging the Facility's finances. *See* Am. Compl. ¶ 64.  Defendant argues that the harm alleged by Plaintiffs "only speaks to future harm if the mortgage on the Kansas facility is foreclosed." Def.'s Reply at 15. Although Defendant may be partially correct, Defendant's argument does not address his alleged failure to negotiate in good faith with the Bank or the alleged ongoing harm to the Facility. *See* Am. Compl. ¶ 64(a-b, i); *see*

*also* Am. Compl. ¶ 47 (giving up $2,700,000 in claims against the Sunwest receivership in exchange for Sunwest's transfer of its interest in the Facility to Defendant). More generally, Plaintiffs suffer harm by being obligated, through the mortgage, to a fiduciary who allegedly has not been acting in Plaintiffs' best interests. *See Am. Compl.* ¶ 65 (seeking a constructive trust over Defendant's interests in the Facility). Further, Defendant realized that his purchase of the loan would potentially subject him to lawsuits brought by the Plaintiff LLCs; Defendant thus knew Plaintiffs might suffer harm. *See* Hoesly Decl., Ex. C-24 ("[T]he new holder of the debt may never actually be able to foreclose on its liens without running the risk of getting sued by [Plaintiff LLCs]."). Accordingly, Plaintiffs' injuries were a foreseeable consequence of Defendant's actions and omissions. *See Neaves*, 912 F.2d at 1065 ("When Gambrell addressed the envelope to Metropolitan, she was purposefully defrauding Neaves in California.").

In sum, Plaintiffs have satisfied the minimum contacts analysis with respect to both purposeful availment and purposeful direction.

### 2.  Arising out of Forum Related Activities

The second requirement for the Court to exercise specific personal jurisdiction "is that the claim asserted in the litigation arises out of the defendant's forum related activities." *Panavision Int'l L.P. v. Toeppen*, 141 F.3d 1316, 1322 (9th Cir. 1998). In other words, the Court must determine whether the plaintiff would not have suffered injury "but for" the defendant's forum-related conduct. *See id.*[2] Generally, the resolution of this prong relies heavily on a court's

---

[2] Defendant argues that Oregon courts have applied a more stringent test for forum related activities. The Court, however, is bound to follow the Ninth Circuit's interpretation of this constitutional issue. *See, e.g., Sher*, 911 F.2d at 1363 n.2 ("Although we address jurisdiction in this case pursuant to the California personal jurisdiction statute, we are not bound by the decisions of California courts; the ultimate question here is one of federal constitutional law.").

resolution of the minimum contacts prong. *See, e.g.*, *Mavrix Photo*, 647 F.3d at 1228 (discussing only the minimum contacts element); *Dole Food*, 303 F.3d at 1114 (same).

Defendant argues that his alleged injury-causing actions all took place in Kansas. Therefore, Defendant maintains, any injury suffered by Plaintiffs was not caused by Defendant's forum-related activities. The scope of inquiry, however, goes beyond the discrete actions Plaintiffs allege breached the contract or fiduciary duty; instead, a court must "evaluate all of a defendant's contacts with the forum state, whether or not those contacts involve wrongful activity by the defendant." *Yahoo*, 433 F.3d at 1207. In particular, the parties entered into an agreement, which triggered both contractual and fiduciary duties. Without this agreement, Defendant's later alleged actions would not have given rise to Plaintiffs' contract or tort claims. In other words, Defendant would have owed no duties to Plaintiffs, which he allegedly breached, without the agreement. Further, Defendant's entire interest in the Facility, before his purchase of the loan, resulted from Plaintiffs relinquishing their claims against Sunwest, which occurred in Oregon. Accordingly, Plaintiffs' claims arise out of Defendant's contacts with Oregon. *See, e.g.*, *Farmers Ins. Exch. v. Portage La Prairie Mut. Ins. Co.*, 907 F.2d 911, 914-15 (9th Cir. 1990) (holding an alleged breach of a duty to defend was the but-for cause of the plaintiff's injuries); *Corp. Inv. Bus. Brokers v. Melcher*, 824 F.2d 786, 789-90 (9th Cir. 1987) (noting that because the plaintiff's claims arose out of the relationship between the parties under their contract, the arising out of prong was met); *Adidas Am., Inc. v. Herbalife Int'l, Inc.*, No. CV 09-661-MO, 2010 WL 596584, at *4 (D. Or. Feb. 12, 2010) (same).

### 3. Reasonable and fair to assert jurisdiction

If a plaintiff satisfies the first two requirements, then a defendant bears the burden of making "a 'compelling case' that the exercise of jurisdiction would not be reasonable."

*Washington Shoe*, 704 F.3d at 672 (quoting *CollegeSource, Inc. v. AcademyOne, Inc.*, 653 F.3d 1066, 1076 (9th Cir. 2011)). To be reasonable, the exercise of jurisdiction must comport with "fair play and substantial justice." *CollegeSource*, 653 F.3d at 1079 (quoting *Dole Food*, 303 F.3d at 1114). The reasonableness of the exercise of personal jurisdiction is dependent on seven factors:

> (1) the extent of the defendants' purposeful injection into the forum state's affairs; (2) the burden on the defendant of defending in the forum; (3) the extent of the conflict with the sovereignty of the defendant's state; (4) the forum state's interest in adjudicating the dispute; (5) the most efficient judicial resolution of the controversy; (6) the importance of the forum to the plaintiff's interest in convenient and effective relief; and (7) the existence of an alternative forum.

*Dole Food*, 303 F.3d at 1114.

Because Defendant does not argue that the Court's exercise of jurisdiction would be unreasonable, Defendant does not make out a "compelling case" of unreasonableness. Nevertheless, the Court has independently evaluated the seven factors in this case.

### a.  Purposeful Injection

If a court determines that a defendant has purposefully directed its actions at the forum state, as discussed above, then the purposeful injection factor favors the plaintiff. *See CollegeSource*, 653 F.3d at 1080 ("Actions directed at a forum resident expected to cause harm in the forum constitute purposeful injection."). Accordingly, this factor favors jurisdiction here.

### b.  Burden on Defendant

"'[W]ith the advances in transportation and telecommunications and the increasing interstate practice of law, any burden [of litigating in a forum other than one's residence] is substantially less than in days past.'" *Id.* at 1080 (alterations in original) (quoting *Menken v. Emm*, 503 F.3d 1050, 1060 (9th Cir. 2007)). Accordingly, this factor is neutral.

### c.   Conflict with Sovereignty of Defendant's State

This factor concerns the extent of any risk that the Court's exercise of jurisdiction in Oregon might conflict with the sovereignty of Kansas, Defendant's state of citizenship. *See Panavision*, 141 F.3d at 1323 (citations omitted). This factor is given relatively little weight when all of the parties are in the United States. *See Core-Vent Corp. v. Nobel Indus. AB*, 11 F.3d 1482, 1489 (9th Cir. 1993), *holding modified by Yahoo*, 433 F.3d 1199 ("In determining how much weight to give this factor, we have focused on the presence or absence of connections to the United States in general, not just to the forum state."). Accordingly, this factor is neutral.

### d.   Forum's Interest in Adjudication

The Ninth Circuit assumes that a forum state "'maintains a strong interest in providing an effective means of redress for its residents tortiously injured.'" *Panavision*, 141 F.3d at 1323 (quoting *Gordy v. Daily News, L.P.*, 95 F.3d 829, 836 (9th Cir. 1996)). Accordingly, this factor favors jurisdiction here.

### e.   Efficient Judicial Resolution

This factor focuses on the location of the evidence and witnesses. As with the factor considering the burden on defendant, this factor "is no longer weighed heavily given the modern advances in communication and transportation." *Id.* at 1323-24. Accordingly, it is neutral.

### f.   The Convenience and Effectiveness of Relief for Plaintiff

Because "in this circuit, the plaintiff's convenience is not of paramount importance," this factor is neutral. *See Dole Food*, 303 F.3d at 1116 (citation omitted).

### g.   Existence of an Alternative Forum

Kansas is an alternative forum; however, the existence of an alternative forum only becomes an issue "when the [original] forum state is shown to be unreasonable." *See*

*CollegeSource*, 653 F.3d at 1080 (quoting *Bauman v. DaimlerChrysler Corp.*, 644 F.3d 909, 929 n.19 (9th Cir. 2011)). Defendant has not established that Oregon is an unreasonable forum.

Weighing these seven considerations favors a finding of personal jurisdiction in this Court. Defendant fails to present a compelling case that the exercise of jurisdiction would be unreasonable.

## C.  Pendant Personal Jurisdiction

In addition to the contract and fiduciary duty claims discussed above, Plaintiffs also assert claims of fraud and negligent misrepresentation. *See* Am. Compl. ¶¶ 62-76. The doctrine of pendant personal jurisdiction permits a district court to exercise jurisdiction over all claims "arising out of a common nucleus of operative facts" when a court may properly exercise personal jurisdiction over any single claim. *See Action Embroidery Corp. v. Atl. Embroidery, Inc.*, 368 F.3d 1174, 1181 (9th Cir. 2004). The parties do not dispute that all of Plaintiffs' claims arise out of a common nucleus of operative fact, and the Court so finds. Accordingly, for the purposes of judicial economy and efficiency, the Court exercises pendant personal jurisdiction over all of Plaintiffs' claims.

**CONCLUSION**

Defendant's Amended Motion to Dismiss for lack of personal jurisdiction (Dkt. 28) is DENIED.

IT IS SO ORDERED.

Dated this 22nd day of July, 2013.

/s/ Michael H. Simon
Michael H. Simon
United States District Judge

Page 24 – OPINION AND ORDER